688 F.2d 552
 29 Fair Empl.Prac.Cas. 1233, 74 A.L.R.Fed. 1,
30 Empl. Prac. Dec. P 33,055
 Melvin PAXTON, Jr.; and Katrina E. Terry; Phyllis Mosley;
Jerry Riley; George Spann, Appellants,
v.
UNION NATIONAL BANK, a corporation, Appellee.
Harold Dominic BROWN, Appellant,
v.
UNION NATIONAL BANK OF LITTLE ROCK, Appellee.
Melvin PAXTON, Jr.; and Katrina E. Terry; Phyllis Mosley;
Jerry Riley; George Spann, Appellees,
v.
UNION NATIONAL BANK, a corporation, Appellant.
 Nos. 81-1650, 81-1656 and 81-1657.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 8, 1982.
Decided Sept. 10, 1982.
Rehearing and Rehearing En Banc Denied Oct. 27, 1982.
 
 John W. Walker, P. A. Hollingsworth, Little Rock, Ark., Jack Greenberg, Ronald L. Ellis, New York City, for appellants.
 James E. Darr, Jr., Little Rock, Ark., for appellee/cross-appellant.
 Before HEANEY, McMILLIAN and ARNOLD, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Eastern District of Arkansas, 519 F.Supp. 136, denying each of the named plaintiffs and intervenors relief, refusing to certify a class action and holding that the Union National Bank of Little Rock did not discriminate against black applicants or employees in any aspect of the employment relationship. We affirm the district court insofar as it denied relief to Melvin Paxton, Katrina Terry and George Spann, and to the extent that it refused to certify a class of black applicants. We hold, however, that Jerry Riley and Phyllis Mosley proved that they were denied promotions on account of their race, and that Mosley was discriminatorily discharged. We further hold that the district court erred in refusing to certify two subclasses of black discriminatees-those discriminated against with respect to promotions and those discriminatorily discharged-and in failing to grant relief to the promotion subclass.
 
 
 2
 We reverse and remand to the district court with directions to it to award appropriate relief to Mosley and Riley, and to the promotion subclass.
 
 I.
 PROCEDURAL HISTORY
 
 3
 These consolidated Title VII and section 1981 actions were brought by Melvin Paxton and Harold Dominic Brown against the Union National Bank of Little Rock, Arkansas, alleging race discrimination in hiring, testing procedures, promotions, discharges, job assignments, compensation and other terms and conditions of employment.[1] They brought suit on their own behalf and on behalf of a class alleged to consist of "all black individuals who are (1) employed by defendant; (2) have sought employment with defendant, but have been refused due to race; (3) might seek employment with defendant; (4) have been employed by defendant and have been adversely affected by defendant's discriminatory practices and policies."
 
 
 4
 Five additional black persons, Katrina Terry, Phyllis Mosley, Jerry Riley, Bobby Scott and George Spann were granted leave to intervene as plaintiffs. Terry, Mosley and Spann were former employees of the Union National Bank, while Riley and Scott were employees at the time of trial. Bobby Scott's case was settled and dismissed prior to trial.[2]
 
 
 5
 The plaintiffs and intervenors moved to certify the litigation as a class action pursuant to Fed.R.Civ.P. 23. The district court, Judge G. Thomas Eisele presiding, began an evidentiary hearing on the certification issue on April 7, 1980. Some time later, the court, with the apparent acquiescence of the parties, informally decided to merge the certification hearing with the trial on the merits and to reserve a decision on the certification issue until the trial was completed. The trial was recessed on April 18, 1980, and not resumed until August 12. On October 21, after fifteen days of hearings had been held, Judge Eisele recused himself. This case was then assigned to Judge Henry Woods. Judge Woods stated that he would not rehear the witnesses that had been called while Judge Eisele was presiding and directed the parties to prepare a transcript of the prior proceedings. He resumed the trial on April 7, 1981, and completed it on April 23, 1981, after eleven additional days of testimony. At the close of the evidence, he refused to certify a class and ruled against the plaintiffs and intervenors on their individual claims.
 
 
 6
 The court treated the case as one involving disparate treatment.[3] It held that the class action failed because the plaintiffs and intervenors had not sustained their burden of proving that Union National Bank discriminated against any class of its employees, and because the plaintiffs had not met the requirements of Rule 23. It found that the plaintiffs had failed to prove a prima facie case of discrimination with respect to any aspect of the employment relationship and that even if they had, the defendant had sustained its burden of articulating a legitimate nondiscriminatory reason for its employment decisions with regard to the six named plaintiffs and intervenors and all other employees whose names had been suggested as putative discriminatees.
 
 
 7
 On appeal, the plaintiffs and intervenors contend that the court erred in failing to certify a class, and in denying relief to the class and named plaintiffs and intervenors.
 
 II.
 GENERAL BACKGROUND
 
 8
 The Union National Bank is a federally chartered bank with a main office and thirteen branches in Little Rock, Arkansas. The bank has been owned by Herbert H. McAdams, an attorney and successful northwest Arkansas banker, since 1971.
 
 
 9
 The bank hired very few black persons prior to 1973. In 1973, McAdams undertook an effort to develop business from black businesses and workers. In furtherance of this goal, McAdams directed Joseph E. Zegler, a vice president and personnel officer of the bank, to institute an affirmative action program designed to bring more black employees into the bank. Zegler published a personnel policy manual, which contained an equal opportunity policy,[4] actively recruited black persons for employment, and initiated a course for them in basic bank training. Black persons were hired into the bank in numbers approximating their numbers in the work force in the Little Rock area.
 
 
 10
 Most of the black employees were hired into entry-level positions.
 
 
 11
 The total number of persons employed by the bank grew from 332 in 1974 to 432 in 1980. The turnover rate among employees during the same period was very high, approximating forty percent per year.
 
 
 12
 The average educational level of black persons employed by the bank during this period was 13.1 years; the average for white employees was 13.5 years. The bank did not preserve the records with respect to the applicant pool; thus, the record does not indicate the number of blacks that applied to the bank for employment or the education and experience of those that did apply.
 
 III.
 ANALYSIS
 
 13
 Our first subject of concern is the timing of the district court's decision with respect to class certification. These consolidated actions were filed on April 12, 1976, and September 25, 1978. Extensive discovery was undertaken by the parties. On April 7, 1980, the court began evidentiary hearings on the propriety of maintaining the consolidated suits as a class action, telling the parties that
 
 
 14
 (w)e had a terrible experience in this court of having a moratorium on civil cases for years. Class actions were filed and they sat here for years, and we've been faced with arguments that people who might have asserted their individual claims did not do so in reliance upon the hope that they would be a member of a class and get benefits that way four or five years after the event.
 
 
 15
 So I think there's been a suggestion that from the point of view of the plaintiff that the earlier the class is certified, the fewer who are left out of that class * * *
 
 
 16
 Then the defendants have a vital stake in an early determination because of the whole scope of the trial on the merits is thereby affected if there's going to be a class at all, and so I think what would have to be done, absent agreement of the parties, there's very little you can't do, that the Court is going to have to take it up preliminarily and make a certification or decide on class at the earliest practicable time.
 
 
 17
 The subsequent decision to delay certification until after the trial was completed, notwithstanding the apparent acquiescence of the parties,[6] "is directly contrary to the command of subdivision (23)(c)(1) that the court determine whether a suit denominated a class action may be maintained as such '(a)s soon as practicable after the commencement of (the) action * * *.' " Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). See Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 273 (10th Cir. 1977).
 
 
 18
 It is rarely appropriate for a court to delay the certification decision until after a trial on the merits. See Eisen v. Carlisle & Jacquelin, supra, 417 U.S. at 177-178, 94 S.Ct. at 2152-53; Horn v. Associated Wholesale Grocers, Inc., supra, 555 F.2d at 274; Peritz v. Liberty Loan Corp., 523 F.2d 349, 353-354 (7th Cir. 1975). It was not necessary to do so here. The discovery undertaken by the parties and the evidence adduced during the early stages of the certification hearing should have provided the court with sufficient information to resolve the question of whether a class action was an appropriate vehicle for plaintiffs' claims. If the court was still in doubt as to the propriety of a class action, it could have made the certification "conditional," and altered or amended its ruling at any time prior to completion of the trial. See Fed.R.Civ.P. 23(c)(1).
 
 
 19
 The prejudice inherent in delaying the certification determination until after trial has been thoroughly explored in the context of litigation under subdivision (3) of Rule 23(b). The courts' concern in Rule 23(b)(3) suits has been to prevent "one-way intervention;" i.e., to protect defendants from putative class members who can "opt-out" of an unfavorable decision rendered simultaneously with class certification but can choose to be bound by a favorable decision. Rule 23(b)(2) suits such as this one, from which class members cannot "opt-out," do not present the same problem. Even in (b)(2) class actions, however, "a deliberate deferral of the (class) determination until full trial on the merits * * * is fraught with serious problems of judicial economy, and of fairness to both sides." Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267, 275 (4th Cir. 1980) (footnote omitted).
 
 
 20
 The court's delay in this case was at the expense of judicial economy. If the court had denied certification or certified a limited class before trial began, the parties and the court could have focused their energies on the narrower issues presented. Neither party, however, can claim that the delay unfairly prejudiced them. Both parties acquiesced in the decision to delay certification. The defendant thereupon fully presented its defense as to all the class and individual claims. The plaintiffs generally proceeded on a class-wide basis as well.[7] Under these circumstances, neither party can assert prejudice from the delay.
 
 
 21
 Notwithstanding the timing of the certification decision, we find that the court abused its discretion in reaching the result that it did. The court should have certified a class consisting of the following two subclasses of blacks who were discriminated against by the bank.[8]
 
 
 22
 (1) Black employees who because of their race were denied a promotion or received lesser salary increases at the time of their promotion than did similarly situated white employees during the period January 1, 1974, to the completion of trial (the promotion class).
 
 
 23
 (2) Black persons with less than two years of experience who were discharged because of their race during the period January 1, 1974, to the completion of trial (the discharge class).
 
 
 24
 We turn first to the promotion class.
 
 
 25
 A. The Promotion Class.
 
 
 26
 1. Class Certification.
 
 
 27
 a. Rule 23(a).
 
 
 28
 Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites to the maintenance of a class action: (i) "numerosity"-the class must be "so numerous that joinder of all members is impracticable"; (ii) "commonality"-the presence of "questions of law or fact common to the class"; (iii) "typicality"-the claims or defenses of the class representative must be "typical of the claims or defenses of the class"; and (iv) a class representative that will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). The requirements must be satisfied as to each subclass. See Stewart v. Winter, 33 Fed.R.Serv.2d 1159, 1168-1169 (5th Cir. 1982). We find that these requirements were satisfied for the proposed class of black bank employees discriminatorily denied promotions.
 
 
 29
 (i) Numerosity.
 
 
 30
 As noted above, the numerosity requirement of Rule 23(a)(1) requires an inquiry into whether the class is "so numerous that joinder of all members is impracticable." A number of factors are relevant to this inquiry, the most obvious of which is, of course, the number of persons in the proposed class. No arbitrary rules regarding the necessary size of classes have been established. Boyd v. Ozark Air Lines, Inc., 568 F.2d 50, 54 (8th Cir. 1977). In addition to the size of the class, the court may also consider the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members. See C. Wright & A. Miller, Federal Practice and Procedure § 1762.
 
 
 31
 The district court did not specifically address numerosity with respect to black employees who had been discriminatorily denied promotions. It stated generally:
 
 
 32
 With regard to numerosity, there are presently 74 black employees at the bank out of a work force of 432. With the exception of intervenors Riley and Scott (who settled his case on the eve of trial), no present black employees of Union National Bank testified that the bank had discriminated against them. A number of blacks presently employed at the bank gave testimony very favorable to the bank on the issue of discrimination-Bill Pierce, Mike Mothershed, Mildred Hall, Charlotte Johnson and Shirley Clingman. There hardly appears to be any great number of blacks at the bank who desire these plaintiffs to represent them in a class action or who would profit from such representation. In fact very few employees purportedly subject to discrimination have been identified. When they have been identified, the basis for the discrimination charge has been exploded either by other testimony, bank records, or testimony from the alleged discriminatees themselves.
 
 
 33
 519 F.Supp. at 172.
 
 
 34
 The record simply does not support the court's statements that no present black employees testified that he or she had been discriminated against by the bank,[9] or that there are not a great number of blacks who desire the plaintiffs' representation. Moreover, these findings confused the merits of the promotion class's claims with the simple question of whether the putative discriminatees were numerous enough to make their joinder impracticable.
 
 
 35
 It was the bank's stated policy to promote from within.[10] This policy was followed in a large majority of cases. During the period 1974-1979,[11] employees received 418 promotions;[12] seventy-five of the promotions went to black persons. The salary increases accompanying these promotions were larger for the white employees than for the black employees in the same salary ranges in ninety percent of the instances. More than eighty of the promotions were to supervisory or managerial positions.[13] Black employees received only two of the latter promotions. It would not be practicable to join all the black employees who received lesser promotions than their white counterparts, or no promotions at all, particularly because none of them, individually, could obtain the broad-based declaratory and injunctive relief that the class representatives sought. See Taylor v. Jones, 653 F.2d 1193, 1204-1205 (8th Cir. 1981); Nance v. Union Carbide Corp., 540 F.2d 718, 730 (4th Cir. 1976), vacated, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977); Danner v. Phillips Petroleum Co., 447 F.2d 159 (5th Cir. 1971). Thus, the numerosity requirement was satisfied as to the promotion class. See, e.g., Horn v. Associated Wholesale Grocers, Inc., supra, 555 F.2d at 275-276 (41-46 class members sufficiently numerous); Arkansas Educ. Ass'n v. Bd. of Educ., Portland Ark. Sch. Dist., 446 F.2d 763, 765-766 (8th Cir. 1971) (20 class members); Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967) (18 class members); Colston v. Maryland Cup Corp., 18 FEP Cases 83, 85 (D.Md.1978) (25 members); Crenshaw v. Maloney, 13 FEP Cases 154, 155 (D.Conn.1976) (16 class members).
 
 
 36
 (ii) Commonality.
 
 
 37
 Rule 23(a)(2) requires that there be common questions of law or fact among the members of the class. The rule does not require that every question of law or fact be common to every member of the class, Mosley v. General Motors Corp., 497 F.2d 1330, 1334 (8th Cir. 1974); Like v. Carter, 448 F.2d 798, 802 (8th Cir. 1971), cert. denied, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972), and may be satisfied, for example, "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." American Finance Sys., Inc. v. Harlow, 65 F.R.D. 94, 107 (D.Md.1974).
 
 
 38
 Judge Woods wasted few words on the issue of the commonality of the promotion class, stating only: "Spann and Terry claim that they resigned from the bank because of discrimination in promotions, but the evidence fails to substantiate this charge as to them or other black bank employees." 519 F.Supp. at 172.
 
 
 39
 Again, Judge Woods applied an incorrect legal standard that was improperly influenced by his view of the merits of the claims. The commonality requirement was satisfied because the following issue pervades all the class members' claims-has Union National Bank discriminated against black employees by denying them promotions and giving them lesser promotions than those given whites similarly situated? See Chisholm v. United States Postal Service, 665 F.2d 482, 492 (4th Cir. 1981). Obviously, the bank's allegedly discriminatory promotion procedures will affect individual employees in different ways because of their diverse qualifications and ambitions. These factual variations are not sufficient to deny class treatment to the claims that have a common thread of discrimination. Duncan v. State of Tenn., 84 F.R.D. 21, 29 (M.D.Tenn.1979).
 
 
 40
 (iii) Typicality.
 
 
 41
 Rule 23(a)(3) requires that "the claims or defenses of the representative parties (be) typical of the claims or defenses of the class." This requirement is generally considered to be satisfied "if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." C. Wright & A. Miller, Federal Practice and Procedure § 1764 at n.21.1 (Supp.1982). See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975); Smith v. B & O R. R., 473 F.Supp. 572, 581 (D.Md.1979). See generally Schlei & Grossman, Employment Discrimination Law, 281-282 (Supp.1979) (hereinafter cited as Schlei & Grossman).
 
 
 42
 Jerry Riley and Phyllis Mosley seek to represent the class of black persons who have been denied promotions or have been given lesser promotions on account of their race. Jerry Riley claims that he was denied a promotion to lead control clerk in the computer department, and that his promotion to computer operator trainee and computer operator were discriminatorily delayed. Phyllis Mosley alleges that she was not promoted out of her telephone clerk job because of her race. The district court did not specifically address the question of whether these claims are "typical" of the claims of the class. We find that they are.
 
 
 43
 Both Riley's and Mosley's claims rest on the same legal theory as that of the class claims; i.e., that they have been subjected to "disparate treatment" in the area of promotions because of their race. Much of the evidence relevant to the individual claims, such as that relating to the subjective nature of the promotion decisions and the bank's failure to post vacancies, will be proffered to prove the class claims as well. Typicality is not defeated because of the varied promotional opportunities at issue, or the differing qualifications of the plaintiffs and class members. See Donaldson v. Pillsbury Co., 554 F.2d 825, 831 (8th Cir.), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); Doe v. First City Bancorporation of Texas, Inc., 81 F.R.D. 562, 569 (S.D.Tex.1978).
 
 
 44
 The typicality requirement as customarily applied tends to merge with "commonality." General Tel. Co. of Southwest v. Falcon, --- U.S. ----, ---- n.13, 102 S.Ct. 2364, 2371 n.13, 72 L.Ed.2d 740 (1982). This Court has given typicality "an independent meaning" by holding that Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., supra, 554 F.2d at 830. Accord, Wright v. Stone Container Corp., 524 F.2d 1058, 1062 (8th Cir. 1975). See White v. Gates Rubber Co., 53 F.R.D. 412, 415 (D.Colo.1971). The court must be shown that the representative is not alone in his or her dissatisfaction with the employer's unlawful practices so as "to assure that there is in fact a class needing representation." Id.
 
 
 45
 The burden of showing typicality is not an onerous one. It does, however, require something more than general conclusory allegations that unnamed blacks have been discriminated against.[14]
 
 
 46
 The plaintiffs have met the quantitative aspect of the typicality requirement. Several employees, in addition to Riley and Mosley, testified that they had been denied timely promotions because of their race and detailed the reasons for their complaints. The testimony of these employees-including Bobby Scott, Ralph Martin, Mildred Hall, Betty Jean Abramhamson, Mabel Johnson and Vickie Nelson-demonstrated the typicality of the plaintiffs' grievances.
 
 
 47
 (iv) Fairly and Adequately Represent the Class.
 
 
 48
 The district court found it unnecessary to reach the question of whether the named plaintiffs would adequately represent the promotion class, because of its determination that their proof failed to delineate any class who should be represented. Because we have held to the contrary, we briefly address this requirement.
 
 
 49
 The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel. Gonzales v. Cassidy, 474 F.2d 67, 72 (6th Cir. 1973). See generally Schlei & Grossman, supra, at 283.
 
 
 50
 Phyllis Mosley and Jerry Riley allege that they have been denied promotions within the bank on account of their race. They share the class' interest in procuring declaratory and injunctive relief to eradicate those aspects of the bank's promotion practices that operate to keep blacks in the lower-level positions in the bank. There is no indication that their interest in procuring their rightful place in the bank's hierarchy will be at the expense of other class members or will, in any other way, be antagonistic to the class' interests. Finally, they have demonstrated a willingness to prosecute the interests of the class through qualified counsel. Mosley and Riley will, therefore, fairly and adequately represent the promotion class.
 
 
 51
 b. Rule 23(b)(2).
 
 
 52
 For the reasons set forth above, we find that the appellants satisfied the requirements of Rule 23(a) in regard to the promotion class. We must still inquire, however, whether that action is maintainable under any of the subdivisions of Rule 23(b).
 
 
 53
 The appellants moved to certify this action under 23(b)(2). Rule 23(b)(2) provides:
 
 
 54
 (b) * * * An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 
 
 55
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole (.)
 
 
 56
 We have held that Rule 23(b)(2) certification is appropriate when plaintiffs seek injunctive relief from acts of an employer "on (the) grounds generally applicable to the class." United States Fidelity & Guar. Co. v. Lord, 585 F.2d 860, 875 (8th Cir. 1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1228, 59 L.Ed.2d 462 (1979). Racial discrimination is such a ground; this case seeking injunctive relief against class-wide race discrimination in the bank's promotion practices was appropriately brought under 23(b)(2). See id. at 875; Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 257 (5th Cir. 1974). The fact that back pay was sought incidentally to the prayer for injunctive relief does not affect this result. E.g., United States Fidelity & Guar. Co. v. Lord, supra, 585 F.2d at 875; Senter v. General Motors Corp., 532 F.2d 511, 525 (6th Cir.), cert. denied, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); Jones v. Diamond, 519 F.2d 1090, 1100 (5th Cir. 1975).
 
 
 57
 2. Merits of the Promotion Class Claims.
 
 
 58
 After a careful review of the 6,000 page transcript and the 150 exhibits comprising this record on appeal, we are left with the firm conviction that the district court erred in holding that the bank did not discriminate against black employees with respect to promotions. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The bank must be given credit for its adoption in the early 1970's of an affirmative action program designed to end discrimination against black applicants and employees. It must also be credited for its implementation of that policy with respect to hirings and some other aspects of the employment relationship. The fact is, however, that the affirmative action policy has not been implemented with respect to the promotion process, and discrimination continues in this area.
 
 
 59
 No single reason for this failure appears from the record; it is rather a combination of factors. White supervisors make most promotional decisions and the criteria for promotions are primarily subjective in nature.[15] The affirmative action program has not been effectively communicated to all supervisors and adherence to that policy is not required by top management. Vacancies are not posted. The system recently adopted to communicate vacancies to employees is incomplete and untimely.[16] Acts of racism in the bank are not always dealt with firmly and fairly.
 
 
 60
 The plaintiffs established a strong prima facie case of racial discrimination with respect to promotions by showing a history of discrimination by the bank; by introducing evidence with respect to each of the factors outlined above; by presenting evidence of individual instances of discrimination; and by detailing statistical evidence which tended to show that qualified black employees were not promoted in even rough parity to their numbers in the promotional pool-employees currently employed in the bank.
 
 
 61
 The bank's primary defense is that the relevant labor market for promotees was the Little Rock area and not the employees within the bank itself. It demonstrated that it had not only hired blacks in accordance with their representation in the general population, but that it hired them for jobs at all levels in accordance with their representation in similar skill levels in the area. The district court accepted this defense.
 
 
 62
 In our view, the district court clearly erred in so doing. The bank's stated policy was and is to promote from within and to give effect to its affirmative action program in the process.[17] Promotion from within was followed in practice. The record shows that the bank filled more than seventy-five percent of above-entry level positions, and over fifty percent of the highest level managerial and technical positions, in this manner. Under these circumstances, it was error to use general population statistics as the basic criteria for determining whether an inference of discrimination arose from the representation of blacks at various levels in the bank's work force. See Mayor of The City of Philadelphia v. Educational Equality League, 415 U.S. 605, 620-621, 94 S.Ct. 1323, 1333-34, 39 L.Ed.2d 630 (1974); Rivera v. City of Wichita Falls, 665 F.2d 531, 541 n.16 (5th Cir. 1982); Fisher v. Procter & Gamble Mfg. Co., 613 F.2d 527, 543-544 (5th Cir. 1980), cert. denied, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981).
 
 
 63
 When the proper labor market is considered, the statistical evidence is sufficient to raise an inference of discrimination.
 
 
 64
 At the time of trial, all but one of the twenty-five vice presidents and assistant vice presidents were white. All division heads were white, as were fifty-four of the fifty-six persons having hiring or firing authority at the bank. Seventy-seven of the eighty bank officers were white, and twelve of the thirteen branch banks were managed by white employees. No black employee was promoted to the position of teller until after this action was commenced and only one black had been appointed a senior teller by the time the trial occurred.[18]
 
 
 65
 Blacks received only a handful of promotions in the three highest paid salary ranges. In 1974, thirty white employees and one black employee received promotions in the three highest paid salary ranges. In 1975, seventeen whites and two blacks received promotions in these categories and in 1976, twenty-nine whites and one black did so. In 1977, the figure was twenty-four whites and six blacks and in 1978, forty-nine whites and eight blacks. In 1979, twenty whites and one black received promotions in these categories. Cumulatively, 169 white employees received promotions in the three highest salary ranges and only nineteen black employees received similar promotions.[19] Thus, over the five year period, black employees received only eleven percent of the promotions to these positions even though their numbers in the work force, their years of experience with the bank and their educational levels indicate that more would have been promoted had the process been free of discrimination. In fact, black employees made little or no progress in being appointed to professional, technical, managerial or administrative positions in the period 1974-1979. The bank employed one person in the technical category in 1974 and only one in 1979, and it employed one in the managerial category in 1974 and only two in 1979.
 
 
 66
 Apart from the history of discrimination, the reliance on subjective criteria in the discretion of white supervisors, and the substantial disparity between black employees available within the bank and the proportion actually promoted, there is further evidence of discrimination in salary increases awarded in connection with promotions. Many promotions involve relatively minor changes in title or job description, accompanied by salary increases within specified ranges. In over ninety percent of the cases, black employees received smaller increases than white employees when promoted within the same salary ranges.[20] The extent to which white employees' salary increases exceeded those of black employees is set forth below:As indicated above, the cumulative effect of the smaller raises given to black persons each year was that the portion of black employees' wages resulting from promotion salary increases, on the average, lagged almost $80 behind the same figure for their white counterparts.
 
 
 67
 The bank's alternative line of defense was the vague assertion that black employees as a whole within the bank were not as qualified as the white employees. This is not supported by the record. On the contrary, the record shows that these two groups' qualifications were substantially equal when measured by two key objective criteria: the black employees had as much experience as the white employees, and their educational level averaged 13.1 years, as compared to 13.5 years for the whites.
 
 
 68
 Little else is offered by the bank to explain the promotional disparities. Unlike the defense to the discharge class' claims, the bank for the most part did not offer specific nondiscriminatory reasons for its failure to promote specific black employees. In those few instances where the bank did attempt to offer specific nondiscriminatory reasons, the explanations were often inconsistent and contradictory. If a black person had more education than the white person receiving a promotion, the bank claimed that it made its selection on the basis of experience. Conversely, if a black employee had more experience than the white promoted, the bank claimed that education was the key to performing that job. And if the black employee had more experience and a better education, the bank often simply stated that the white employee was better qualified without giving a reason for the decision. This set of ad hoc, contradictory and conflicting explanations does not even begin to explain the broad pattern of promotional discrimination as a whole, much less is it convincing as to the relatively few instances in which it was proffered. Moreover, no explanation whatsoever was proffered to justify the salary discrimination between blacks and whites who were promoted within the same salary ranges.
 
 
 69
 The overriding facts are that black employees were not promoted to positions for which they were qualified and when they were promoted, they consistently received salary increases significantly less than comparable white employees. Thus, the plaintiffs' proof as a whole not only stated a prima facie case, but also carried the ultimate burden of proof as against the bank's limited attempt at an alternative explanation. The only conclusion which is reasonable on this record is that the bank discriminated on the basis of race in making promotions during the period up to the time of this action.
 
 
 70
 B. The Discharge Class.
 
 
 71
 1. Class Certification.
 
 
 72
 We find that the plaintiffs satisfied the requirements of Rule 23(a) and 23(b) (2) with regard to the discharge class. We will address this issue only briefly, however, because of our holding, infra, that although this class should have been certified, there was insufficient proof of class-wide discrimination against the discharged black employees.
 
 
 73
 The class of black employees discriminatorily discharged from the bank was sufficiently numerous to make joinder impracticable. Fifty-three blacks were discharged during the period 1974-1980. The record shows that they were discharged at a rate twice that of the white dischargees. The class claims have a common question of law and fact-that is, were the blacks discharged because of their race? Phyllis Mosley's allegation that she was discharged from her telephone clerk position on account of her race is typical of the claims of the discharge class. Mosley has also shown that she is not alone in her dissatisfaction with the bank's racially discriminatory practices. Two persons besides herself, Melvin Paxton and Harold Brown, testified that they had been actually or constructively discharged from their positions because of their race. This was coupled with evidence that several of the blacks who were discharged for cause were granted unemployment compensation benefits after hearing.[21]
 
 
 74
 Further, Mosley has shown that she can fairly and adequately represent the class of black dischargees. Her claim rests on the same "disparate treatment" theory that underlies the class claims. She has shown a willingness to prosecute this action through qualified counsel to vindicate her personal interests and those of the class.
 
 
 75
 Finally, the discharge class' claims were properly brought under Rule 23(b)(2) to seek declaratory and injunctive relief to prevent further class-wide discriminatory discharges. The district court should have certified a class of black persons discriminatorily discharged from the bank.
 
 
 76
 2. Merits of the Discharge Class Claims.
 
 
 77
 The plaintiffs established a prima facie case of racial discrimination regarding the bank's discharge of black employees. They did so by proving a history of discrimination in the bank's employment practices, by introducing statistical evidence that showed that blacks with less than two years of service were discharged at more than twice the rate of white employees in the same group[22] and by proving that Phyllis Mosley was discharged on account of her race. See Taylor v. Teletype Corp., 648 F.2d 1129, 1135 (8th Cir.), cert. denied, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981).
 
 
 78
 The plaintiffs' prima facie case was rebutted by the defendant. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); Locke v. Kansas City Power and Light Co., 660 F.2d 359, 365 (8th Cir. 1981); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1254 (8th Cir. 1981). The bank articulated a reason for each and every discharge of a black employee by introducing employment records which listed the reason why each employee with less than two years of service had been discharged. The reasons were varied. They included dishonesty, excessive overdrafts, absenteeism, inefficiency and tardiness.
 
 
 79
 It was then incumbent on the plaintiffs and intervenors to prove that the given reasons were pretextual in at least enough instances that the court could find a pattern and practice of racial discrimination against blacks in the discharge class. They failed to do so with respect to any dischargee other than Phyllis Mosley. Indeed, they did not attempt to rebut the articulated reason with respect to any black employees other than the named plaintiffs or intervenors. Thus, they failed to meet their burden of persuading the court that the class of blacks discharged by the bank had, in fact, been discriminated against on account of their race.
 
 
 80
 C. Individual Claims.
 
 
 81
 1. Jerry Riley.
 
 
 82
 The district court concluded that there was no credible evidence that Jerry Riley was subjected to racial discrimination with respect to promotions and salary increases. Although there is insufficient evidence from which to conclude that Riley was discriminated against in terms of salary increases, the district court erred in concluding that Riley had not been the victim of a racially motivated promotion decision.
 
 
 83
 Riley graduated from Pine Bluff High School in 1976, and was hired by the bank shortly thereafter. He pursued his education throughout his tenure at the bank. At the time of trial, he was a junior at the University of Arkansas at Little Rock (UALR), and had completed almost eighty credit hours of business-related courses.
 
 
 84
 Riley's first job at the bank was that of messenger in the mail room. He was paid $400 a month. There were three black clerks in the mail room and one white clerk. The mail room was supervised by a white.
 
 
 85
 Riley quit his mail-room job on December 31, 1976. On July 1, 1977, he was rehired for the same job at a monthly salary of $425. Six weeks later, Riley requested a transfer out of the mail room. He remained a messenger, however, until November 7, 1977, when he was promoted to "control clerk" in the computer department of the bank. He held that position until March 15, 1980; he then became a computer operator trainee. He still held that position when the trial began.
 
 
 86
 Riley contends that: (1) he was discriminatorily passed over for a promotion to "lead control clerk" in July, 1979, in favor of Gina White, a white woman; and (2) the bank delayed his advancement to computer operator trainee and computer operator on account of his race. We first address the "lead control clerk" controversy.
 
 
 87
 In July, 1979, Gina White, a control clerk in the bank's computer department, was promoted to the position of lead control clerk. The lead control clerk does essentially the same work as the control clerk, but has the additional duties of training the other clerks and assuming their functions when one of them was away from their job.
 
 
 88
 Riley was qualified to be the lead control clerk. He had two years of control clerk experience at the time the position opened. On April 20, 1979, only three months before the supervisor vacancy occurred, Riley's supervisor characterized Riley as "a loyal employee who is always eager to learn new things. He is good at his job and doesn't mind helping others. He doesn't mind working overtime when we need help or are in a jam."
 
 
 89
 Furthermore, Riley's employer was sufficiently on notice that Riley would likely be interested in the lead control job. Riley had expressed to Ray Whittier, the computer center manager, his desire to advance in the bank, specifically in the computer center. The lead control clerk position would be a logical advancement for Riley. In light of Riley's unrefuted testimony that the vacancy was not posted and that he did not, through other means, learn of the vacancy until after it had been filled, we cannot hold that Riley's prima facie case was defeated because he did not formally "apply" for the lead control job.
 
 
 90
 Finally, Riley's prima facie case of racial discrimination was complete when evidence was introduced showing that Gina White, a person outside the protected group at issue, received the lead control clerk position. See Freeman v. Lewis, 675 F.2d 398, 401 (D.C.Cir.1982). The burden then shifted to UNB to articulate a legitimate, nondiscriminatory reason for its failure to promote Riley to lead control clerk. See Texas Dep't of Community Affairs v. Burdine, supra, 450 U.S. at 254, 101 S.Ct. at 1094; Locke v. Kansas City Power and Light Co., supra, 660 F.2d at 365; Johnson v. Bunny Bread Co., supra, 646 F.2d at 1254.
 
 
 91
 Neither the district court's opinion nor the defendant's brief on appeal identified a legitimate, nondiscriminatory reason for the failure to promote Riley. We assume from our reading of the record that Raymond Whittier's testimony regarding the lead control clerk opening constituted the bank's defense to Riley's prima facie case. Whittier advanced two reasons for the decision: (1) White was more qualified, and (2) White had more experience in the control functions of the division.
 
 
 92
 Because the UNB "articulated a legitimate, nondiscriminatory reason" for failing to promote Riley, it was incumbent on Riley to show that the proffered reason was in fact a "pretext" for a racially motivated employment decision. Again, the defendant's briefs and the district court's opinion are silent as to Riley's evidence of pretext. Our task of review is complicated by the district court's failure to specifically address in any way the lead control clerk promotion issue. The district court merely noted that that claim was the basis of Riley's November, 1979, EEOC charge. We have chosen, however, to treat the court's general conclusion-that Riley did not suffer "racial discrimination at this bank as far as promotions * * * are concerned"-as its finding of fact on this specific issue. 519 F.Supp. at 170. We have done so because even if we afford that "finding" the deference an appellate court must give to the district court's findings of fact, it cannot stand.
 
 
 93
 We cannot give credence to the bank's contention that White was better qualified. Riley had more experience in the division, he was better educated and he had a good work record. The witness testifying that White was better qualified gave no reason for this conclusion; this conclusion was completely subjective. Nor can we give credence to the claim that the job involved more control work than distribution work.[23] The record does not support the claim. Moreover, Gina White could not perform all the tasks required of the lead control clerk. We thus conclude that the bank's failure to promote Riley-an experienced, favorably rated control clerk-was racially motivated.
 
 
 94
 Jerry Riley also claims that the bank discriminatorily delayed his advancement to computer operator trainee and computer operator. We find that Riley failed to prove these claims.
 
 
 95
 In December, 1979, Ray Whittier offered Riley a job as computer operator trainee. The promotion was to be effective as soon as Riley could train someone to replace him as control clerk. Whittier had difficulty finding someone acceptable for the control clerk job, so Riley did not assume his trainee status until March, 1980.
 
 
 96
 Riley claims that he should have been promoted to computer operator trainee as early as May, 1979,[24] and that he was damaged as a result of the delay. At that time, Bobby Scott was fired from his trainee job, and Riley expressed an interest in replacing Scott. The job was given to David New, a white person with no prior experience with the bank.
 
 
 97
 Riley has proved a prima facie case of racial discrimination regarding the bank's failure to promote him to the May, 1979, trainee vacancy. He was qualified for the position. It was not necessary that the trainee have experience as a computer operator, as was demonstrated by the bank's decision to hire New, who had no such experience. In May, 1979, as in December, 1979, Riley had accumulated a significant amount of experience at the bank and was generally viewed as a competent computer center employee.
 
 
 98
 Riley's prima facie case was rebutted by the bank, however. Whittier testified that New was hired because he was a computer science major at the UALR and had completed a number of computer science courses in pursuit of his degree.
 
 
 99
 Riley did not show that the bank's "articulated nondiscriminatory reason" for hiring New instead of himself was a pretext for racial discrimination. During the period 1977-1980, the bank consistently hired or promoted persons into the computer jobs who had actual operator experience or who had progressed significantly toward computer science degrees. The record reveals only one exception to this: Riley, who was given a trainee job even though he had no computer operator experience and was not taking computer courses at UALR. Thus, we are not faced with the flaw in the bank's general rebuttal to the promotion class claims, where varying, inconsistent rationales have purportedly underlain the bank's promotion decisions. Riley acknowledged at trial that taking computer science courses at UALR "would allow someone to move faster in data processing at the bank." We conclude that the bank's proffered rationale for hiring New over Riley, based on a consistently applied preference for persons who have a demonstrated interest in computer science, was not shown to be pretextual.
 
 
 100
 Riley also claims that he should have been promoted from trainee to computer operator sooner than he was. At least one operator vacancy occurred between June, 1980, when Riley alleges he was qualified to assume full operator status, and September, 1980, when he was promoted. That vacancy was filled by a white person.
 
 
 101
 In our view, Riley has failed to prove that the length of his training period was the product of racial discrimination. On this record, we cannot find that Riley was qualified to become an operator at some point sooner than he did. The bank introduced a memorandum dated July 11, 1980, three months after Riley became a trainee, that outlined various deficiencies in Riley's performance at that time. Whittier testified that in July, 1980, when the operator vacancy occurred, Riley's supervisors felt that he was not ready to assume that responsibility because there were various operator functions that Riley could not yet perform.
 
 
 102
 Riley does not seriously dispute that his training was incomplete at that time, but argues that this fact was not his fault, that the supervisors did not give him the time and assistance at the computer console necessary to complete his training. Riley and Whittier testified, however, that the night shift had always been the busiest time for the computer operators, so that they had little time to supervise and assist a trainee's work at the console. Because of this, Whittier suggested that Riley work day-shift hours to facilitate his training, as did Chuck Howland, a white employee training at about the same time. Riley refused to switch his hours because that would interfere with his college schedule. Thus, we are unable on this record to attribute the problems of Riley's six-month training to racial discrimination by the bank.
 
 
 103
 2. Phyllis Mosley.
 
 
 104
 In our view, the trial court's specific finding that race played no part in Phyllis Mosley's termination is clearly erroneous. Its implicit finding that race played no part in the bank's failure to promote her is equally erroneous.
 
 
 105
 Mosley, a high school graduate-with one-half year of college-was employed by the bank as a file clerk on August 1, 1977, at a salary of $425 per month. She was transferred to the position of telephone clerk on August 21, 1977. Four of the seven file clerks were black. Four of the five telephone operators were black. The supervisors of the departments during Mosley's tenure were white.
 
 
 106
 Mosley was a good employee. She received salary increases on October 16, 1977, January 1, 1978, April 1, 1978, and March 16, 1979. She consistently worked more overtime than other employees-black or white. Notwithstanding Mosley's record, white employees who were hired after her were promoted out of the department in which she was employed to better jobs. A white woman, who came into the department after Mosley, was made supervisor of the department shortly after Mosley was terminated.
 
 
 107
 On March 29, 1979, Mosley reported to work before 8:00 a. m. Three other employees in the department, including at least two white employees, left the job before 5:00 p. m. Mosley told her supervisor that she had to leave at 5:30 p. m. to catch a bus to her home-some sixteen miles from Little Rock. Mosley stated that she had no alternative way to get home and left at 5:30 p. m.
 
 
 108
 Mosley was then told that she had to work overtime whenever she was requested to and that failure to do so would be considered insubordination. She complained about the unfairness of the overtime distribution.
 
 
 109
 On April 2, 1979, Mosley again reported to work before 8:00 a. m. During the day, she went to Personnel Director Zegler's office and talked to him about being promoted to supervisor of her department. Sometime in the afternoon, she was again told that she would have to work after 5:30 p. m. By the time she was told, it was too late for her to make other arrangements. At least three white employees of the department left at the regular quitting time, 4:30 p. m.; one other white employee left at 5:05 p. m. Mosley left at 5:30 p. m., after being warned that she would be discharged if she did. She was discharged. No reason was advanced at trial as to why the overtime was not fairly distributed or why the white employees were permitted to go home at the regular quitting time while Mosley, who had previously worked more overtime than the white employees, had to work after 5:30 p. m. Further, Mosley's summary termination was in violation of the bank's disciplinary policy as set out in its Personnel Policy Manual.[25]
 
 
 110
 Mosley established a prima facie case with respect to her discharge. Her work record, her record of working overtime and the statistical evidence with respect to the discharge of black employees with less than two years service, are more than sufficient in this regard.
 
 
 111
 The bank did articulate a specific reason for Mosley's discharge, but in our view, Mosley introduced more than sufficient evidence to show that the reason was pretextual.
 
 
 112
 Mosley was not only a good employee, she insisted that she be treated fairly. She worked hard and asked to be promoted; she complained when racial slurs were directed at her[26] or at blacks generally, and finally complained that overtime was not being distributed fairly. Notwithstanding her work record and requests, the defendant made no effort to accommodate her need to catch her bus at 5:30 p. m., even though they accommodated others and let some employees go home at the regular 4:30 p. m. time. No other employee of the bank had been discharged for failing to work overtime, and the handbook does not make such an offense a dischargeable one.
 
 
 113
 Mosley also established a prima facie case with respect to her promotion claim. Her education, experience and work record all qualified her for promotion. She requested that she be promoted; and not only were her requests denied, but white employees with less experience were given the promotions or white persons with no experience in the bank were hired off the street for the jobs to which she aspired. The defendant failed to articulate reasons for Mosley being passed over other than to repeat the general statement that it was their practice to hire the best qualified person. No specific evidence was offered to support this contention, and Mosley's evidence was sufficient to prove it to be pretextual.
 
 
 114
 Certainly, Union National Bank has a right to insist that blacks, as well as whites, obey direct orders, but they also have an obligation to treat blacks fairly in the distribution of overtime and with respect to promotional opportunities. Here, the record as a whole leads to only one conclusion, and that is that Mosley was discharged[27] and denied promotions because of her race.
 
 
 115
 3. Melvin Paxton.
 
 
 116
 On April 12, 1976, Melvin Paxton filed a charge with the EEOC, alleging that he had been hired as a management trainee and that he should have been paid the same salary as other white trainees-$600 per month. He was paid considerably less than that sum. Shortly after the charge was filed, Paxton was called into the office of Zegler, the personnel director, and questioned at great length as to the reasons for his filing the charge and his dissatisfaction with the bank. The interrogation upset Paxton and he resigned on the spot. The trial court found that Paxton was not a management trainee. It characterized him as an unsatisfactory employee with an extremely bad work record. It found that Paxton had not been either actually or constructively discharged.
 
 
 117
 While we do not believe that the record supports the view that Paxton was an unsatisfactory employee and while we believe that a factfinder could have found that Paxton was constructively discharged, we are unable to say that the trial court's finding with respect to the alleged discharge is clearly erroneous. We likewise hold that the trial court's finding that Paxton was not hired as a management trainee was not clearly erroneous.
 
 
 118
 We do, however, hold that Zegler's intensive interrogation of Paxton as to why he filed a charge of discrimination with the EEOC was violative of 42 U.S.C. § 2000e-3, and that the bank should be enjoined from such activities in the future.
 
 
 119
 4. Katrina Terry, George Spann and Harold Dominic Brown.
 
 
 120
 The trial court's finding that Terry, a black female, and Spann, a black male, were neither denied promotions nor discharged for reasons relating to their race were not clearly erroneous. The trial court's findings that Harold Brown, a black male, was discharged for reasons unrelated to his race were not clearly erroneous.
 
 
 121
 D. Relief.
 
 
 122
 1. Class Relief.
 
 
 123
 Title VII has vested broad equitable powers in the federal courts to fashion a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future.[28] Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); Firefighters Inst. v. City of St. Louis, Mo., 588 F.2d 235, 240 (8th Cir. 1978), cert. denied, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979). To the end that a proper decree be fashioned, we remand the matter to the district court with directions to it to give the plaintiffs an opportunity to prove the extent to which class members were damaged by their being denied promotions on account of their race, to award class members who were denied promotions the monetary damages they have sustained and to provide for their promotion to the first vacancy that occurs in a position for which they are qualified. See Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 443-444 (5th Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). The district court is also directed to fashion a decree which will insure that race will not be a factor in future promotional decisions by the bank. The court shall require that at least the following practices be instituted:
 
 
 124
 The bank shall develop job descriptions for all positions other than entry-level ones. The descriptions shall be in writing and shall set forth the general requirements and responsibilities for the position as well as any specific skills that are required, salary ranges for the position and any other lawful employment criteria utilized by the bank. See Patterson v. American Tobacco Co., 535 F.2d 257, 273 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).
 
 
 125
 The bank shall develop standards for selection to each affected position. These standards, based upon a job analysis, shall be to the extent possible, "reasonably objective" in nature and job related. See Muller v. United States Steel Corp., 509 F.2d 923, 927-928 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); Baxter v. Savannah Sugar Refining Corp., supra, 495 F.2d at 441; United States v. N. L. Industries, Inc., 479 F.2d 354, 377 (8th Cir. 1973).
 
 
 126
 To the extent that the personnel director of the bank relies upon recommendations of supervisory personnel in selecting persons for non-entry level positions, the recommendations shall be in writing and shall be in accordance with written guidelines. See Stewart v. General Motors Corp., 542 F.2d 445, 450 (7th Cir. 1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Patterson v. American Tobacco Co., supra, 535 F.2d at 273; Brown v. Gaston County Dyeing Mach. Co., supra, 457 F.2d at 1383.
 
 
 127
 The bank's practice of limiting employees considered for bank officer positions to only those recommended by division heads shall be discontinued. Employees shall be given an opportunity to initiate requests for promotions. See Watkins v. Scott Paper Co., 530 F.2d 1159, 1193-1194 (5th Cir.), cert. denied, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976).
 
 
 128
 The bank shall be required to post timely notices of all non-entry level job vacancies in a conspicuous place in the bank. Such notice shall contain a reasonably specific description of the position to be filled, the responsibilities involved, the qualifications required, the salary range for the position and the procedure for applying for the position. See Senter v. General Motors Corp., supra, 532 F.2d at 529; Rowe v. General Motors Corp., supra, 457 F.2d at 360-361; United States v. Jacksonville Terminal Co., 451 F.2d 418, 458 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).
 
 
 129
 Any information regarding an employee's performance, including periodic ratings, supervisory recommendations, productivity records, discipline records, attendance records and other information relating to her or his employment at the bank shall be made available to the employee upon her or his request.
 
 
 130
 The bank shall develop procedures for promptly resolving disputes with respect to promotions comparable to the system mandated by the Court in Alexander v. Aero Lodge No. 735, Intern. Ass'n, Etc., 565 F.2d 1364, 1386-1387 (6th Cir. 1977), cert. denied, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978).
 
 
 131
 The bank shall develop standards to insure that black employees being promoted will receive salary increases equivalent to comparably situated white employees.
 
 
 132
 The injunctive relief outlined above may not be sufficient to insure that the bank's practice of discriminating against blacks with respect to promotions will be eliminated. It may be necessary to order the bank to meet reasonable goals in this regard. See Chisholm v. United States Postal Service, supra, 665 F.2d at 498-499; Firefighters Inst. v. City of St. Louis, Mo., supra, 588 F.2d at 239. We feel that the district court should make this decision after the parties have been given an opportunity to be heard on it.
 
 
 133
 We finally direct that a decree be fashioned which will enjoin the bank from intimidating or otherwise harassing employees who have filed charges with the EEOC.
 
 
 134
 2. Individual Relief.
 
 
 135
 Phyllis Mosley is entitled to be reinstated to the position she previously held, see Danner v. Phillips Petroleum Co., supra, 447 F.2d at 163; Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1197 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), and given back pay, Albemarle Paper Co. v. Moody, supra, 422 U.S. at 418, 95 S.Ct. at 2372. Mosley's award should be determined by measuring the difference between actual earnings for the relevant time period and those which she would have earned absent the unlawful discrimination by the defendant. The latter calculation would include back pay from the date of discharge to the present and any increases she would have received within that period. See Satty v. Nashville Gas Co., 522 F.2d 850, 855 (6th Cir. 1975), aff'd in part and vacated in part on other grounds, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). See also Golay & Co. v. N. L. R. B., 447 F.2d 290, 294 (7th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 737, 30 L.Ed.2d 745 (1972). Mosley is also entitled to receive as part of her back pay award any fringe benefits she would have received had she remained employed by Union National Bank. Pettway v. American Case Iron Pipe Co., supra, 494 F.2d at 263; Bowe v. Colgate, Palmolive Co., 489 F.2d 896, 903 (7th Cir. 1973).
 
 
 136
 Once the gross amount of back pay owed Mosley has been determined, the burden shifts to Union National Bank to prove what should be deducted from that award as "(i)nterim earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g).
 
 
 137
 In light of our earlier finding that Mosley was denied promotions on account of race in violation of Title VII, she is entitled to receive compensation for wages lost as a result of the failure of the bank to promote her to the position of supervisor of her department. See Patterson v. American Tobacco Co., supra, 535 F.2d at 269; Berio v. EEOC, 19 FEP Cases 168, 169 (D.C.Cir.1979); Chisholm v. United States Postal Service, 516 F.Supp. 810, 878 (W.D.N.C.1980), aff'd, 665 F.2d 482 (4th Cir. 1981). She is also entitled to "recover in the future the rate of pay of the position * * * (s)he was denied until (s)he is placed in a job of equal or higher pay grade." Chisholm v. United States Postal Service, supra, 516 F.Supp. at 878-879, citing Patterson v. American Tobacco Co., supra, 535 F.2d at 269. She is moreover to be promoted to the first vacancy that she is qualified to fill. Chisholm v. United States Postal Service, supra, 516 F.Supp. at 879.
 
 
 138
 Similarly, Jerry Riley is entitled to compensation lost as a result of the bank's discriminatory failure to promote him to lead control clerk in July, 1979. In determining this amount, the court must also consider the effect this decision had on Riley's wages not only while he continued to be a control clerk but after he was promoted to trainee and computer operator as well. Ray Whittier testified that the salary received by an employee prior to a promotion is an important consideration in setting the minimum salary for the new position. Thus, the bank's failure to promote Riley to lead control clerk and accordingly raise his salary may have had a continuing depressive effect on his subsequent salary schedule and that must be taken into account by the district court on remand.
 
 
 139
 Costs shall be taxed to the appellee. The appellants and intervenors shall submit to this Court a verified request for attorneys' fees for this appeal together with all data necessary to support the request within thirty days of the entry of this order. The appellees shall have ten days thereafter to submit objections, if any, that it may have to appellants' and intervenors' request.
 
 
 
 [1]
 Norman Williams, a former black employee of Union National Bank, also filed a Title VII complaint making similar allegations against the bank. His case was dismissed before trial without objection pursuant to Fed.R.Civ.P. 41(b)
 
 
 [2]
 Scott testified at trial. His testimony was considered by the court as relevant to the class claims and will be similarly considered by this Court
 
 
 [3]
 An argument can be made that the promotion class claims should have been decided under the discriminatory impact theory. See Williams v. Colorado Springs, Colo. Sch. Dist., 641 F.2d 835, 839-842 (10th Cir. 1981). As we detail, infra, the plaintiffs proved that the racial composition of the bank's work force at most above-entry levels does not reflect the composition of available qualified persons in the relevant labor pool. The court could have concluded from this that the sum of the defendant's promotion methods, although not administered with a discriminatory intent, impacted more heavily on blacks in the bank's work force. See Vuyanich v. Republic Nat. Bank of Dallas, 521 F.Supp. 656, 662 (N.D.Tex.1981). The bank would have then had to show that the disparate results were attributable to identifiable, neutral personnel practices that were necessary to its business. Id
 We will, however, review the promotion class claims under a disparate treatment theory. The plaintiffs are not prejudiced by this approach because of our holding, infra, that the plaintiffs' proof was sufficient to find a pattern or practice of intentional racial discrimination in the bank's promotion decisions. The defendant is not prejudiced either because, in contrast to the rule in disparate impact cases, the bank was never forced to assume the burden of persuasion as to any aspect of this case.
 With respect to the discharge class, the trial court properly tried it as a case involving disparate treatment. The plaintiffs did not allege that any facially neutral employment policies impacted more heavily on blacks. They simply alleged that the bank had intentionally discriminated against blacks by discharging them because of their race.
 
 
 [4]
 The manual stated in part:
 It is the policy of Union National Bank to implement affirmatively equal opportunity to all qualified employees and applicants for employment without regard to race, creed, color, sex, religion, or national origin. Positive action shall be taken to insure the fulfillment of this policy, including: 1. Hiring, placement, upgrading, transfer or demotion. 2. Recruitment, advertising or solicitation for employment. 3. Treatment during employment. 4. Rates of pay or other forms of compensation. 5. Selection for training. 6. Termination. This policy is consistent with the requirements and objectives set forth by the Presidential Executive Orders.
 Our objective is to obtain individuals qualified and/or trainable for positions by virtue of job related standards of education, training, experience and personal qualifications.
 Responsibility for insuring compliance and implementation of the Bank's policy on equal employment opportunity is assigned to the Personnel Director. The Executive Committee will review this policy every twelve months and measure the results against these stated objectives.
 NUMBER OF EMPLOYEES
 AS OF DECEMBER 31
 Percent
Year Total White Black Black
---- ----- ----- ----- -------
1974 332 293 39 11.8
1975 316 262 54[5] 17.1
1976 343 288 55 16.0
1977 393 320 73 18.6
1978 408 336 72 17.7
1979 441 362 79 17.9
1980 432 358 74 17.1
 
 
 [5]
 This figure includes the fifteen black graduates of the basic training school instituted by the defendant. The school was discontinued in 1977 or 1978 when it became clear that the banks in Little Rock were not hiring its graduates
 
 
 [6]
 We assume that the agreement was an informal one reached in chambers, as there is no record of it in the transcript
 
 
 [7]
 As we note, infra, the plaintiffs failed to fully develop evidence as to the discharge-class claims. Because of the plaintiffs' consent to the delay, it is irrelevant that this failure of proof may have been due in part to the lack of a pretrial certification decision
 
 
 [8]
 The plaintiffs contend that the district court also erred in failing to certify a class of black employees who were paid an initial salary rate less than similarly situated white employees. The plaintiffs made no serious effort, however, to satisfy the requirements of Rule 23 as to this class and we therefore need not discuss it on appeal
 
 
 [9]
 The court attached considerable importance to the testimony of the six witnesses enumerated above in its finding that the bank had not discriminated against blacks in any respect. While some of these witnesses stated that they had not been discriminated against and that they had not observed that other blacks had been discriminated against, the specifics of their testimony presented a different picture and tended to support the plaintiffs' case
 Mike Mothershed testified that although a majority of the employees in the mail room have been black persons, a black has never managed the department. He stated that at least four white persons hired after him and who did the same work he did received promotions before he did and that he was paid less than the minimum salary established for the jobs that he held. He did not know until the time of trial that a white computer trainee was paid nearly as much as he, an operator with several years of experience. Although Mothershed has served as a supervisor for several years, he was never told about the bank's affirmative action plan nor given instructions as to how to evaluate employees for possible pay increases or promotions.
 Mildred Hall, a black female, testified that when she went to work for the bank in 1978, her supervisor and the white employees working for her showed their resentment for her because she was a black woman taking the place of a white man. She stated that even though she has two years of college, seventeen years experience as a supervisor and an excellent work record, she has not been named an officer of the bank and has not been given an opportunity to get into the management training program. She has received raises of only four to five percent per year, considerably less than other supervisors, even though she has been told that her work is outstanding. Contrary to the district court's specific finding, Mrs. Hall did not deny that she or other black employees had been discriminated against.
 Charlotte Johnson, a black female, employed in the bank's personnel office, testified that about one-half of all applicants for jobs with the bank are black. She could not remember if she had ever been told about the bank's affirmative action plan, but denied ever being told that the blacks hired by the bank from the special training program were high-risk employees. She was aware of the fact that there were several all-white departments in the bank, including data entry, proof control and some branch banks. She also stated that Melvin Paxton was discharged-he did not resign.
 The testimony of Bill Pierce and Shirley Clingman was supportive of the bank's position.
 
 
 [10]
 See note 17, infra
 
 
 [11]
 The defendants introduced two differing exhibits purporting to show the employment figures for 1980. Because of this ambiguity, we have eliminated the 1980 totals
 
 
 [12]
 Union National Bank defines a promotion as an employment decision that results in a change of duties closely accompanied by a salary increase
 
 
 [13]
 See Defendant's Exhibits 34(c)-34(h). Only those promotions in the highest reported salary range are included in this number
 
 
 [14]
 Hearsay testimony may be admitted to demonstrate typicality. See Donaldson v. Pillsbury Co., 554 F.2d 825, 830-831 n.3 (8th Cir.), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977)
 
 
 [15]
 Promotional procedures wherein white supervisors make the promotional decisions on the basis of largely subjective criteria must be closely scrutinized because of their susceptibility to discriminatory abuse. See Coble v. Hot Springs School Dist., 682 F.2d 721 (8th Cir. 1982); Royal v. Missouri Highway & Transp. Comm'n, 655 F.2d 159, 164 (8th Cir. 1981); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 240-241 (5th Cir. 1974); Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1383 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972)
 
 
 [16]
 Bank employees have traditionally learned of vacancies by word of mouth. In April, 1979, the bank began publishing notices of vacancies in its newsletter. All vacancies have not been included, however, and the notices sometimes appeared after the vacancy had already been filled. The notices often excluded such information as the qualifications necessary to fill the position or the salary range for the job
 
 
 [17]
 The bank's Personnel Policy Manual states:
 Promotion Criteria
 The Bank policy on filling openings is to do so from within where possible. This may be from within the department where the opening exists or by transfer from another department.
 The decision to promote is based on many factors. These include, but are not necessarily limited to, performance in present position, specialized skills and background, preparation by the individual for assumption of additional responsibilities, AIB courses completed, in-house training completed, etc. Seniority is to be used as a factor only if two candidates are considered equally qualified in all other respects.
 In every promotion decision, the Bank's Affirmative Action Programs will be considered.
 
 
 [18]
 The bank's experience with tellers illustrates the fact that the paucity of black promotees can not be attributed to low turnover in the bank. Sixteen black persons were appointed to teller positions between the commencement of this action and the completion of trial. The turnover rate among bank employees in all but the highest pay categories approximated forty per cent from 1974-1980
 
 
 [19]
 It appears that the only classes of employees in the highest salary range were professional and technical employees, managers and administrators. Thus, 104 promotions were to middle-level positions through the period 1974-1980. Even if it is assumed that no black employees were qualified to fill the positions in the highest salary range-an assumption which is not supported by the record-the fact remains that black employees were clearly qualified by education and experience to fill most positions in the second and third highest salary ranges. These two ranges included almost all of the middle-level supervisory positions and many first-level supervisors
 
 
 [20]
 The bank's expert witness, Dr. James Gwartney, applied a "regression analysis" to the earnings of each employee of the bank as of a specific date and concluded that the differences in salary levels between black and white employees could be explained on the basis of differences in education, seniority, full-time versus part-time work, computer experience, bank management experience and other management experience. The bank management factor was said by Dr. Gwartney to account for $83.44 per month of the salary differentials. To the extent the analysis included this factor, it reflected, rather than explained away, discrimination by the bank in its promotion decisions
 Dr. Gwartney did not analyze the salary increases granted to employees who were promoted over the period 1974-1979. Thus, his testimony did not explain the disparity in salary increases accompanying promotions given to similarly situated black and white employees.
 Cumulative
 Dollar Amount Per Month Annual
 Per Month Dollar Amount Percentage
Year in Excess in Excess in Excess
---- ------------- ------------- ----------
1974 17.94 36
1975 ( 2.96) 14.98 ( 5)
1976 8.80 23.78 16
1977 11.00 35.14 18
1978 25.53 60.67 54
1979 18.45 79.12 26
 
 
 [21]
 Discharged employees may be denied unemployment compensation benefits under Arkansas law if they were discharged for "misconduct." Misconduct is something more than "cause," and has been variously defined by the Arkansas courts as "a disregard of standards of behavior which the employer has a right to expect," Parker v. Ramada Inn, 264 Ark. 472, 572 S.W.2d 409, 411 (1978), or "an intentional or substantial disregard of an employer's interests or of an employee's duties and obligations." Willis Johnson Co. v. Daniels, 269 Ark. 795, 601 S.W.2d 890, 893 (Ct.App.1980). Because Union National Bank is free to lawfully discharge its black employees for reasons that do not amount to "misconduct" within the meaning of Arkansas's unemployment compensation law, as long as the reasons do not relate to race, we have not considered the unemployment compensation awards as evidence on the merits of the discharge class' claims. We believe, however, that the fact that a significant proportion of the discharged blacks filed for and received these claims is probative of the likelihood that a number of those blacks felt aggrieved, on racial grounds, by the bank's discharge practices. Cf. White v. Gates Rubber Co., 53 F.R.D. 412, 415 (D.Colo.1971)
 
 
 [22]
 We find no support in the record for the district court's observation that more black employees in the target group were discharged than white employees because the black persons hired were less qualified than their white counterparts. The defendant's expert witness testified that the higher discharge rate for black employees could be explained on one of two theories: (1) that the bank did not apply the same discharge standards to whites that it did to blacks and thus discriminated against the latter group; or (2) that the bank hired high-risk black employees from employment pools or training programs who had little work experience and could not be expected to pan out as well as the white employees. He declined to adopt either theory as his own and said that it was up to the court "to look at (the) discrimination data on an individual-by-an-individual basis and see whether or not the discharge was or was not justified."
 
 
 [23]
 Riley testified to the contrary. We note that Riley's testimony was before Judge Eisele. We are thus free to independently judge the credibility of this testimony because Judge Woods, like us, did not observe the witness but only reviewed the transcript. See Johnson v. Mabry, 602 F.2d 167, 170-171 (8th Cir. 1979). We find Riley's statements credible
 
 
 [24]
 The district court characterized Riley's claim as being much broader involving all persons hired as computer operators after August, 1977. The district court clearly erred in doing so
 
 
 [25]
 The district court found:
 The bank has a discipline policy which is spelled out in its personnel policy manual and in its supervisor course. If an employee's performance is not satisfactory, the supervisor first advises the employee orally. If the sub-par performance continues, the employee is advised in writing of the specific criticism. If this does not work, a plan for improvement is instituted in which the supervisor and employee sit down, discuss the problem and what steps are needed to correct it. The next step, called a notice of disciplinary probation, involves a formal notice in writing of the need to correct the employee's deficiency. This notice is discussed personally with the employee and is signed by him. At this point the employee is placed on probation and given a specified number of days, usually between thirty and ninety, to take corrective action. If all these measures have failed, dismissal is considered. There are nine division heads, fifty-six department heads and sixty-nine supervisors in the bank. If there is a flagrant offense, the supervisor is authorized to terminate an employee on the spot. A flagrant offense is described by the bank's personnel director as theft, fighting, threatening a customer, refusing to follow a reasonable order or something of a similar nature. Otherwise, the decision to discharge is made only by the personnel director, the division manager and the department head in joint consultation. In the event of a disagreement, the final decision to terminate is made by the personnel director, who can be overruled only by the executive vice president. The written memoranda with respect to discipline goes into the employee's personnel file.
 
 
 [519]
 F.Supp. at 146
 
 
 [26]
 Mosley testified that she was subjected to racial slurs on at least two occasions and was victimized by being given a copy of an offensively worded "Nigger" application. She complained to management about the slurs and received an apology from an offending white employee on one of the occasions
 
 
 [27]
 Mosley made application for unemployment compensation benefits; the bank protested. The Arkansas Employment Security Board held that Mosley was entitled to benefits
 
 
 [28]
 42 U.S.C. § 2000e-5(g) provides in pertinent part:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay * * *, or any other equitable relief as the court deems appropriate. * * * Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.