Herman SCHUMACHER, Michael
P. Callicrate, and Roger D.
Koch, Plaintiffs,

v.

TYSON FRESH MEATS, INC., Excel Corporation, Swift Beef Company, and National Beef Packing Company, L.L.C.,
Defendants.

No. CIV.02–1027.

United States District Court,
D. South Dakota,
Northern Division.

June 7, 2004.

David F. Herr, Elizabeth J. Anderson, James Duffy O'Connor, Kirk O. Kolbo, R. Christopher Sur, Maslon, Edelman, Borman & Brand, Minneapolis, MN, Reed A. Rasmussen, Seigel, Barnett & Schutz, Aberdeen, Stephen O. Broghammer, Thomas M. White, White, Wulff & Smart, Omaha, NE, for Plaintiffs.

Bartholomew L. McLeay, Thomas J. Kenny, Kutak Rock, Omaha, NE, Daniel R. Fritz, Aberdeen, Brad P. Rosenberg, Michael E. Lackey, Jr., Mayer Brown Rowe & Maw L.L.P, Washington, D.C., Kennith L. Gosch, Bantz, Gosch, Cremer, Peterson, Sommers & Wager, Aberdeen, Christopher Wayne Madsen, Thomas John Welk, Boyce Greenfield Pashby & Welk, L.L.P., Leo A. Knowles, Michael M. Douglas, Jack H. Hieb, Richardson, Groseclose, Wyly, Wise and Sauck, Aberdeen, Louis A. Huber, III, Schlee Huber McMullen & Krause, Kansas City, Missouri, Patrick E. Brookhouser, Jr., McGrath North Mullin & Kratz, Omaha, NE, for Defendants.

## ORDER

KORNMANN, District Judge.

### BACKGROUND

[¶ 1] Defendants are all packers who are in the business of purchasing cattle from cattle producers, slaughtering the cattle, and selling the carcass or parts thereof to wholesalers and retailers for consumption by the public. Defendants are the four largest packers in the United States and account for 80% of the cattle purchased for slaughter in the nation. Much of the cattle purchased by the defendants is processed into what is known in the industry as "boxed beef." Boxed beef consists of a package weighing approximately 78 pounds containing vacuum-sealed portions of beef. It is the primary product that packers sell to their customers.

[¶ 2] The prices received by beef packers for boxed beef are factors of some importance in determining the price packers pay cattle producers for fed cattle. On April 2, 2001, the United States Department of Agriculture ("USDA") began collecting and publishing twice daily the boxed beef prices received by the packers, the collecting and

reporting having been required by the Livestock Mandatory Reporting Act of 1999 ("LMRA"), 7 U.S.C. §§ 1635–1636h. On May 14, 2001, USDA discovered that, due to its own faulty software (the "blame the computer syndrome"), USDA was incorrectly reporting to the public (including, of course, cattle producers) the prices of "choice" and "select" boxed beef because USDA erroneously included the price of lower valued "no-roll" in computing choice and select boxed beef prices. The result was that the publicly reported prices of choice and select boxed beef were substantially lower than the correct prices which had been duly reported to USDA by the packers.

[¶ 3] Plaintiffs filed this action against the four major packers alleging that, during the first six weeks that USDA began reporting boxed beef prices, defendants knowingly used the inaccurate prices published by USDA to negotiate the purchase of slaughter cattle from plaintiffs at prices substantially lower than would have been economically justified had plaintiffs known the accurate higher prices that defendants were receiving for their boxed beef. Plaintiffs contend that defendants' conduct constituted an unfair or deceptive practice in violation of the Packers and Stockyards Act ("PSA"), 7 U.S.C. §§ 181–229. Plaintiffs also seek damages under common law unjust enrichment principles, alleging that cattle producers received many millions of dollars less than they would have been entitled to demand from defendants during that approximate six week period of time.

[¶ 4] This matter is before the court on plaintiffs' motion to certify this matter as a class action pursuant to Fed.R.Civ.P. 23. A rigorous analysis is required.

## DECISION

Federal Rule Civil Procedure 23(a) permits class certification where:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1539 (8th Cir. 1996). The four prerequisites for class certification can be referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Paxton v. Union National Bank,* 688 F.2d 552, 559 (8th Cir. 1982). "An action may be maintained as a class action only if all four prerequisites of Rule 23(a) are satisfied and, in addition, one of the three subsections of Rule 23(b) is met." *Pickett v. IBP,* 197 F.R.D. 510, 513 (M.D.Al.2000). "The burden is on the party who seeks to certify a class to show that the prerequisites of Rule 23 are established." *Id.*

### (1) Numerosity.

[¶ 5] Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable. Plaintiffs contend that there are thousands of putative class members who sold cattle to each of the defendants during the proposed class period." A July 2, 2001, report to the Secretary of Agriculture from the Livestock Mandatory Price Reporting System Review Team (hereinafter "LMPR report") (see Doc. 38) noted that in 2000, about 116 feedlots accounted for about 40% of feedlot cattle marketed while the rest of the 97,091 feedlots collectively accounted for the remaining 60% marketed. The report noted that 2.84 million feeder cattle were sold during the proposed class period. The report states in another section that, based upon Agricultural Marketing Service data, 3.211 million head of steers and heifers were marketed during those 6 weeks. Those figures are known to exclude auction barns and packers not required to report sales. About 26% of the sales during the proposed class period were direct sales.

[¶ 6] The report does not offer an estimate of the number of different producers who marketed cattle during the proposed class period. However, taking into account the LMPR report's figures as to the number of feedlots marketing on an annual basis, one would expect the class to exceed 100 (I assume from common knowledge that major feedlots market at least monthly, not just

once a year) and possibly 1000 potential members. Tyson admits in its brief that it purchased cattle during the proposed class period from thousands of producers. There are no arbitrary rules regarding the necessary size of classes, *Paxton,* 688 F.2d at 559, but, clearly, the numerosity requirement is easily satisfied here.

[¶ 7] In addition to the size of the class, I may take into account "the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members." *Paxton,* 688 F.2d at 559–560. Producers who sold only 100 fed cattle at the target weight of 750 pounds would, taking into account a conservative $0.30 difference per cwt in price, *see* LMPR report, have allegedly received approximately $225 less as a result of the under reported boxed beef prices.[1] Producers who sold fewer animals would have incurred an even smaller economic impact. Very few litigants would embark on expensive protracted litigation in the hope of recovering $225 or less.

[¶ 8] I also believe that, because defendants purchase over 80% of the cattle in this country, individual cattle producers would have a disincentive to come forward and sue the defendants. Most cattle producers cannot risk losing their only buyers should defendants choose not to do business with them any longer.

**(2) Commonality.**

[¶ 9] While Rule 23(a) requires "questions of law or fact common to the class," it "does not require that every question of law or fact be common to every member of the class." *Paxton,* 688 F.2d at 561. Commonality may be satisfied "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Paxton,* 688 F.2d at 561 (*quoting American Finance Sys., Inc. v. Harlow,* 65 F.R.D. 94, 107 (D.Md.1974)). *Accord, Christina A. ex rel. Jennifer A. v. Bloomberg,* 197 F.R.D. 664, 667 (D.S.D.2000).

[¶ 10] Some of the proposed class members' common claims are that the defendants violated the PSA by knowingly paying artificially low prices for live cattle during the proposed class period or that the defendants were unjustly enriched or both such events. I believe language from my previous ruling in this case which ruling denied the motion to dismiss may have indicated that the question is whether defendants had a statutory duty under the PSA to refrain from deceptively using plaintiffs' misconceptions as to the prices of boxed beef, using the same against plaintiffs in negotiating for the purchase of the live cattle.

[¶ 11] As I have thought about the matter and looked more carefully at the PSA, the issues are not nearly as narrow as I previously suggested. The PSA *inter alia* speaks of packers *engaging in* any unfair practice or device (7 U.S.C. § 192(a)). This speaks in the active sense and would require a finding that packers had done something that was "unfair." Is it "unfair" to pay less for livestock than the cattle were actually worth, assuming, of course, that plaintiffs can prove that? This same statutory provision of the PSA speaks of packers *using* any unfair or deceptive practice or device. This speaks in both a possible active sense and a possible passive sense. The questions would then be: have the packers, regardless of what they knew or should have known during the class period, used or taken advantage of an unfair practice (keeping all the "excess value" of the cattle) or of a deceptive practice (USDA errors)?

[¶ 12] In looking at the PSA, we know that the chief evil feared was "the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace,* 258 U.S. 495, 514–515, 42 S.Ct. 397, 401, 66 L.Ed. 735 (1922).

[¶ 13] We know also that 7 U.S.C. § 192(b) prohibits packers from subjecting "any particular person" to any "undue or unreasonable prejudice or disadvantage in any respect." This is all very broad lan-

---

**1.** 100 animals times 750 lbs divided by cwt times $0.30 equals $225.

**610**

guage. It is as broad or more so than "unfair." I fully realize that packers are not fiduciaries as to cattle producers. The fact remains that packers may violate the PSA without being fiduciaries, depending on the facts in a given case. We know that a practice is "unfair" under the PSA if it injures or is likely to injure competition. *Farrow v. U.S.D.A.*, 760 F.2d 211, 214 (8th Cir.1985). Was "competition" likely to be injured by the USDA errors and the packers taking advantage of them? The bottom line, however, is that there has never been a case like the present case. Because "unjustly discriminatory", as used in 7 U.S.C. § 192(a), and the terms "undue or unreasonable preference or advantage" and "undue or unreasonable prejudice or disadvantage" as used in 7 U.S.C. § 192(b), are not defined in the PSA, the meaning of such terms must be determined according to the facts of each case within the broad public purposes of the PSA. *See In re IBP, Inc.* (1958), 57 Agric. Dec. 1353, 1998 WL 462705, p. 25 and note 22.

[¶ 14] We know also that 7 U.S.C. § 192(e) provides that no packer may "[E]ngage in any course of business or do any act ... *with the effect* of manipulating or controlling prices ..." (emphasis supplied). The question therefore is what was the effect and not what was the intent. Were prices in fact manipulated or controlled? Plaintiffs contend they were.

[¶ 15] "One of the purposes of this act was to protect the owner and shipper of live stock, and to free him from the fear that the channel through which his product passed, through discrimination, exploitation, overreaching, manipulation, or other unfair practices, might not return to him a fair return for his product." *United States v. Donahue Brothers*, 59 F.2d 1019, 1023 (8th Cir.1932). This is broad language indeed, and is the law of this circuit.

[¶ 16] I have set forth above the legal questions common to the class. In addition, a common legal question exists as to whether there is any legal requirement for plaintiffs to prove that the packers knew or at least should have known while purchasing cattle from producers that the USDA reports were incorrect. I tend to believe there is no such

requirement but the answer to that question can be left for another day. A common legal question also exists as to whether it may be presumed that sellers relied on the boxed beef price reports.

[¶ 17] Questions of fact common to the class include whether, if there is any such legal requirement for plaintiffs to prove their case, the defendants knew or should have known that the boxed beef prices for select and choice grades or either such grade were being under reported by USDA, whether the under reported boxed beef prices caused prices being paid to producers by defendants to be lower and, if so, to what extent. In addition, common issues of fact or mixed questions of fact and law exist as to unfairness, deception, undue or unreasonable prejudice or disadvantage, and engaging in any course of business or doing or using any act which has the effect of manipulating or controlling prices of fed cattle. A common question of fact also exists as to what happened to fed cattle prices after the USDA reporting errors were discovered and acknowledged and what caused any such changes in prices. The expert witness for defendants says "nothing" and the expert witness for plaintiffs says a "lot."

[¶ 18] Defendants claim that factual issues unique to each proposed class member predominate in this litigation. I reject that contention and find that, for purposes of the certification issue, the following matters are immaterial:

1) Whether some producers who bought cattle may have made money by paying less than what they should have, this as a result of USDA errors. If the sellers of those cattle want to sue the buyers, they can do that. The packers have nothing to do with those matters. One of the issues in this case is whether the defendants were unjustly or unfairly enriched as a result of the errors, not whether someone else was.

2) Whether some producers thought the USDA numbers were wrong.

3) Whether some producers questioned whether the USDA numbers were wrong.

4) Whether some producers bought feeder cattle or any other cattle during the alleged class period.

5) Whether some producers sold through feedlots.

6) Whether some producers heard one or more representatives of the defendants say that the "box is down" or something similar.

7) Whether some producers received Cattle–Fax and some did not. If the boxed beef prices being reported had no influence on sales of live cattle, there obviously would be no recovery by plaintiffs or the class.

8) Whether all plaintiffs sold cattle to all defendants. If they sold none to a particular defendant, that particular plaintiff will obviously recover nothing against that particular defendant.

9) Whether some producers did not monitor the USDA boxed beef price reports and paid no attention to such items.

10) Whether some producers sold cattle on days when the incorrect USDA numbers indicated that the box was "up" whereas it was actually down. If any such producers did that in dealing with defendants, the defendants could be entitled to an offset.

11) Whether factors other than USDA errors had an influence on the price paid for cattle during the alleged class period.

12) Whether plaintiffs' expert perhaps does not intend to express any opinion about the effects on feeder cattle or on prices in the futures market.

13) Whether defendants did not know during the alleged class period that the prices being reported were wrong.

14) Whether any conspiracy can be shown between or among the defendants.

15) Whether certain producers made money or lost money during the class period.

[¶ 19] It is entirely appropriate to determine whether the misreporting caused damages to producers. That is one of the crucial issues here. The LMPR report concluded that, during the proposed class period, the choice grade cutout was under reported by an average of $2.85 per cwt while the select grade cutout was under reported by an aver-age of $0.70 per cwt. It was estimated that, had the reporting errors not occurred, the price of choice slaughter steers would have averaged $0.31 per cwt. higher; the price of select steers would have averaged $0.29 per cwt higher; and the price of feeder cattle would have averaged $0.33 per cwt higher. Based upon the number of cattle marketed during the proposed class period, the LMPR report concluded that the value of sales of fed cattle was reduced by $14,000,000.00.

[¶ 20] Defendants claim that the proposed plaintiff class members suffered no damages as a result of the erroneously reported boxed beef prices. I reject this contention outright as contrary to common sense. Even the USDA is convinced that the under reporting had an impact upon the cattle producers in the millions of dollars. Further, arguing that no damages resulted from incorrect boxed beef reporting flies in the face of Congress' findings that price reporting is essential for the producers to obtain fair market value for their cattle.

[¶ 21] Defendants also contend that damages will be difficult, if not impossible, to calculate on a class basis. They also contend that the plaintiff class members' claims do not satisfy the commonality requirement because each class member will have suffered a different measure of damages, if any.

> "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person (i.e., a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would)."

*Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1146 (8th Cir.1999). Defendants' arguments

in this regard do not defeat class certification.

[¶ 22] Defendants contend that one of the dominating issues, which issue is not common, is whether the class members' damages may be offset by gains they received when buying feeder cattle. It should be noted that no offset claim (an affirmative defense) has been pled by the defendants. In any event, that is not a true offset claim unless it is contended that some of the feeder cattle bought by the proposed class members were bought from the defendants. Those issues are not material in this action. As set forth previously, that is a matter between the buyers and sellers of the feeder cattle and in some other legal action.

[¶ 23] Defendants contend that, since there are a wide variety of factors which are taken into account in determining the price to be paid for any particular pen of cattle, common issues of damages do not predominate. I reject this contention. I have previously noted the importance of price reporting statutes.

It is in the national interest to encourage and protect family farms and ranches and to enhance and promote the stability and well being of rural America. More competitive markets would result in higher prices to producers. Equal access to accurate pricing and purchase information would improve the competitiveness of the livestock market. Poor or no information can lead to unnecessary price volatility and tardy or inaccurate adjustments to changing supply and demand conditions. Inadequate or uneven information can cause producers to be disadvantaged, relative to packers. Disclosure of prices fosters competition and results in an efficient functioning of the market. Disclosure significantly reduces distrust and a certain amount of hostility which now exists between producers and packers. Information concerning prices paid by packers for livestock enables producers to be more competitive, to make management changes, including risk management decisions, and to better determine what type livestock can be produced most profitably.

*American Meat Institute v. Barnett,* 1999 D.S.D. 23 ¶ 45, 64 F.Supp.2d 906, 919–920 (D.S.D.1999).

[¶ 24] Further, for what it is worth, Congress must have concluded that the boxed beef prices (twice daily) were important for cattle producers to know. I previously held that the "price received by beef packers for boxed beef is a principal factor in determining the price packers pay cattle producers for slaughter cattle." *Schumacher v. IBP, Inc.,* CIV 02–1027, Doc. 130 p. 3 (September 26, 2003) (order denying motion to dismiss).

[¶ 25] Certification of the unjust enrichment claims is more complicated. Defendants contend that class certification of the pendent state law claims for unjust enrichment should be denied because these claims involve varying state common law standards of liability. Differences in state law claims may outweigh the similarities, precluding class certification as to those claims. *Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 72 (D.Or.1983).

[¶ 26] Where federal claims and common law claims are predicated on the same factual allegations and proof will be essentially the same, "[e]ven if the law of different states might ultimately govern the common law claims—an issue that need not and is not decided at this juncture—certification of the class for the whole action is appropriate." *Walsh v. Chittenden Corp.,* 798 F.Supp. 1043, 1055 (D.Vt.1992). "The spectre of having to apply different substantive law (sic) does not warrant refusing to certify a class on the common-law claims." *Id.* (quoting *In re LILCO Securities Litigation,* 111 F.R.D. 663, 670 (E.D.N.Y.1986))."

[¶ 27] In looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs. That is a universal thread throughout all common law causes of action for unjust enrichment. What is the practical difference between a practice that is "unfair" and a practice that results in "unjust enrichment"? What is the difference between "unfair" and "unjust"? The answers are probably very little.

[¶ 28] Failure to certify the claims for unjust enrichment would or could result in class members having to file virtually thousands of individual suits wherein the discovery and factual issues would be nearly identical.

[¶ 29] There are some differences between or among the states. There are also many states where the common law is the same. Sub-classes can be identified, if necessary, to group residents of various states with identical common law requirements into sub-classes. In other words, the problems are manageable. For all we know at this stage, there may be states from which no proposed member of the class may appear. The claims for unjust enrichment should also be certified.

[¶ 30] Defendants have identified a number of alleged conflicts within the proposed class which should prevent certification. I have reviewed those carefully and conclude that they are not conflicts at all. Some of the alleged conflicts merely point out that some class members will have a different measure of damages, if any damages are allowed. Further, I reject any contention that there is any conflict between (1) proposed class members who believed the reported boxed beef prices were inaccurate and those who did not so believe, (2) producers who directly negotiated for the sale of their cattle and those who relied upon feedlot owners, (3) producers who heard defendants' buyers use the claim that "the box is down" during negotiations and those that did not, or (4) producers who did not rely upon the reported boxed beef prices in making marketing decisions and those that did so rely. None of the foregoing matters at all in determining whether the defendants engaged in or used an unfair practice or device or whether they were unjustly enriched by the USDA's reporting errors and defendants taking or maintaining unfair advantage of them.

### (3) Typicality.

[¶ 31] The Eighth Circuit holds that the typicality requirement of Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff.'" *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 608 (8th Cir.1983) (*quoting Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830 (8th Cir.1977)); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996). "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir.1995). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d at 1540; *Christina A. ex rel. Jennifer A. v. Bloomberg,* 197 F.R.D. at 668.

[¶ 32] The requested class is "all persons or business associations [which would seem to be included by 'persons'] that owned any interest in cattle that were intended for slaughter and sold such cattle (excluding culled dairy and beef cows and bulls) to defendants on the open spot cash cattle market, or on a basis affected by that market." Plaintiffs Schumacher and Koch are typical of cattle producers, although they may market more cattle annually than many producers. Plaintiff Callicrate is also a producer in the sense that he sells fed cattle. He is also a feedlot owner and is representative of the larger feedlot owners who market cattle on a large scale.

[¶ 33] The typicality requirement is met when other members of the proposed class have "the same or similar grievances as the plaintiff." *Paxton,* 688 F.2d at 562. Typicality exists if the proposed class members have the same or similar grievances in that they have been subjected to the same allegedly unlawful treatment as the named plaintiff. *Id.* Plaintiffs' claims are that, during the proposed class period, defendants "unfairly" or "unjustly" profited from the errors in reporting boxed beef prices when the defendants purchased fed cattle from the plaintiffs. That is the same allegedly unlawful treatment suffered by the proposed class members. This prong of the rule is satisfied.

### (4) Adequacy of Representation.

[¶ 34] "The adequate representation inquiry involves questions of whether the

plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation." *Pickett v. IBP*, 197 F.R.D. at 514. I have no doubt that plaintiffs' counsel are qualified and experienced litigators. Defendants do not claim otherwise. Judging by the size of this file, it is also clear that they are able to conduct litigation of this magnitude. In fact, the Maslon, Edelman, Borman & Brand law firm has recently been successful in obtaining class relief in *Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (holding that the University of Michigan's racial preferences policy in undergraduate admissions violated the Equal Protection Clause, Title VI, and 42 U.S.C. § 1981).

[¶ 35] The matter of adequate representation also involves questions whether the plaintiffs are proper class representatives. This court must "evaluate carefully the legitimacy of [a] named plaintiff's plea that he is a proper class representative under Rule 23(a)." *In re Milk Products Antitrust Litigation*, 195 F.3d 430, 436 (8th Cir.1999) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The class representative must have "a sufficient incentive to represent class members" and a desire to "vigorously pursue" the interests of the class. *Id.* at 437. There is no doubt that each of these plaintiffs has a desire to vigorously pursue litigation against the packers, as they have done in other cases. There is no doubt that they are representative of class members who sold fed cattle to the defendants during the class period. Plaintiff Schumacher resides in South Dakota and sold cattle to Swift[2] and Tyson[3] on a cash basis during the proposed class period. Plaintiff Callicrate owns a feedlot in Kansas and sold cattle on both a cash basis and using a formula marketing arrangement to Excel, Swift and National Beef[4] during the proposed class period.

Plaintiff Koch resides in Nebraska and sold cattle primarily on a cash basis to Tyson and Excel during the proposed class period.

[¶ 36] Even if the plaintiffs can establish that they are willing and able to vigorously and adequately pursue the class' claims, their claim to representative status may be defeated if their interests are antagonistic to or in conflict with the objectives of the class and such conflict "is a fundamental one, going to the specific issues in controversy." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir.2000). Defendants claim that some putative class members benefited from the under reported boxed beef prices when they purchased feeder cattle. The Eleventh Circuit pointed out in *Pickett* that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." 209 F.3d at 1280. The proposed class here is limited to those producers owning an interest in cattle that were sold under certain circumstances to the defendants during the proposed class period. It is apparently true that some producers also bought during that period and may have benefitted from the reported lower prices with respect to those transactions. However, there is no claim that such producers purchased fed cattle from the defendants. If they purchased fed cattle or other cattle from other producers, we have a "so-what" situation. If some producers sold cattle too cheap so as to unjustly enrich other producers, the sellers can file a lawsuit to seek recovery. In addition, the PSA was enacted largely to protect producers from packers and stockyards. There are no antagonistic interests sufficient to defeat claims to class status.

[¶ 37] Defendant National Beef challenges Mr. Callicrate's status as a class representa-

---

2. ConAgra Beef Company was an originally named defendant. On June 19, 2003, I granted a motion to substitute Swift Beef Company, f/k/a ConAgra Beef Company for ConAgra as the named defendant.

3. Tyson Foods Inc. was an originally named defendant. On February 24, 2003, I orally granted Tyson's motion to substitute IBP, inc. for Tyson.

On May 3, 2004, I granted a motion to substitute Tyson Fresh Meats, Inc. for IBP.

4. Farmland National Beef Packing Company, L.P. was an originally named defendant. On October 18, 2003, I granted a motion to substitute National Beef Packing Company, L.L.C. for Farmland.

tive, citing questions as to credibility. I am very concerned about what happened in the trial before Judge Lyle Strom in Alabama. Judge Strom is a very mild mannered and fair judge. I have a great deal of respect for him. He would be very hesitant and careful before concluding that a witness had testified untruthfully. He did so conclude with regard to Mr. Callicrate. He also instructed the jury accordingly, a very unusual step for a judge to take. Again, Judge Strom would not have done that had he not felt strongly that such instruction was appropriate. I am thus very concerned about Mr. Callicrate and I would examine very carefully any testimony he might offer. I also realize that Mr. Callicrate steadfastly maintains that some of his testimony before Judge Strom was simply a mistake and not perjury. I was not there to hear the testimony. Apparently, judging by the size of the verdict, the jury members were not troubled by the testimony. Having said all this, I will not deny Mr. Callicrate status as a class representative on this basis. I have never had a problem controlling lawyers and parties appearing in my court and I will manage this lawsuit as I do other actions. I also have confidence in the abilities of counsel for plaintiffs to control their clients. I believe they will not permit any witness, whether a client or not, to advance claims without checking carefully to be sure that there is a proper foundation for such testimony and claims.

[¶ 38] National Beef also attacks Mr. Callicrate's status as class representative based upon his crusade against the defendant packers. Mr. Callicrate is certainly hostile to packers. He has made some rather outlandish statements about packers. That said, there is no question that Callicrate will vigorously litigate the class' claims. The fact that National Beef dedicates ten pages in its brief attacking Mr. Callicrate's representative status may suggest either that there is no other legitimate reason to deny class certification or that National Beef does not wish to litigate against an experienced and vigorous litigator. I will not disqualify Mr. Callicrate on the basis urged.

[¶ 39] Excel challenges Mr. Callicrate's status as class representative, calling him "a one-man litigation machine" and claiming that he "has an uneasy relationship with the truth." I will not deny Mr. Callicrate the status of a class representative.

[¶ 40] National Beef has filed a supplemental memorandum (Doc. 129) seeking to disqualify Mr. Callicrate. National Beef's claim is that Mr. Callicrate was an investor in Ranch Foods Direct LLC which entity purchased fed cattle and thus "took advantage" of the USDA errors. This claim is without legal merit. First, Ranch Foods Direct LLC does not seek to represent any class. It is not a plaintiff. It is a separate entity from Mr. Callicrate. Second, even if Mr. Callicrate was the sole investor in the limited liability company, it would be totally immaterial whether such entity profited from USDA errors. As I have already observed, if producers who sold fed cattle "too cheap" to Ranch Foods wish to pursue litigation, they can do so. None of this has anything to do with plaintiffs *vis a vis* defendants.

[¶ 41] Excel challenges Mr. Koch's status as a class representative based upon (1) a USDA cease-and-desist order arising out of PSA violations, (2) the fact that he suspected that the USDA reported boxed beef prices were in error during the proposed class period, and (3) the fact that he hedged most of the cattle he sold during the proposed class period, thus allegedly demonstrating that he was not harmed by the USDA errors. The cease and desist order is old news. Whether or not Mr. Koch suspected USDA errors is immaterial at this point and probably hereafter.

[¶ 42] Tyson challenges Mr. Koch's status as class representative, contending that he knew or suspected that the reported boxed beef prices were incorrect and that he is therefore not typical of the class members who were not so aware. Again, this is immaterial. The issues ultimately will be whether the defendants were unjustly enriched or violated the PSA or both such actions. I will not deny Mr. Koch the status of a class representative. No one is a "perfect litigant" or without sin.

**Rule 23(b) prerequisites.**

[¶ 43] In addition to satisfying the Rule 23(a) conditions precedent to class certifica-

tion, one of the following three conditions must be satisfied:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action

■■■ [¶ 44] Plaintiffs assert that class certification in appropriate under 23(b)(3).

Framed for situations in which "class-action treatment is not as clearly called for" as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit "may nevertheless be convenient and desirable." Adv. Comm. Notes, 28 U.S.C.App., p. 697. To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Ibid.*

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 2245–46, 138 L.Ed.2d 689 (1997).

[¶ 45] The Advisory Committee for the 1966 amendments to Rule 23 suggested:

The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable.

*Amchem Products, Inc. v. Windsor*, 521 U.S. at 615, 117 S.Ct. at 2246 (*quoting* Adv. Comm. Notes, 28 U.S.C.App., p. 698).

[¶ 46] As I have previously observed, the proposed class consists of people who, because of the size of their claims, "would be without effective strength to bring their opponents into court at all." *Amchem Products, Inc. v. Windsor*, 521 U.S. at 617, 117 S.Ct. at 2246.

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's

(usually an attorney's) labor." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997).

*Amchem Products, Inc. v. Windsor*, 521 U.S. at 617, 117 S.Ct. at 2246.

[¶ 47] Notwithstanding the conclusion that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," Rule 23(b)(3) also requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." "[T]he predominance requirement" of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that "claims or defenses" of the named representatives must be "typical of the claims or defenses of the class." *Amchem Products, Inc. v. Windsor*, 521 U.S. at 623 n. 18, 117 S.Ct. at 2249 n. 18. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. at 623, 117 S.Ct. at 2249.[5]

[¶ 48] With respect to the PSA claims, it is clear that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." I reject any contention by the defendants that resolution of the PSA claims will require individualized proof of whether statements were made by representatives of defendants that "the box is down" in negotiating for the purchase of fed cattle or whether class members relied on any such representations. The issue under the PSA is whether the defendants engaged in or used any "unfair" practice or device. I have already discussed in the "commonality" section of this order what I believe are the common questions of law and fact.

[¶ 49] Claims for unjust enrichment present more difficulties. The common law elements of unjust enrichment are not identical in each state. We know, for example, that in Iowa, the doctrine is based on the concept of an implied contract. Iowa refuses to imply a contract where there is an express contract. *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985) (rejecting a claim for unjust enrichment where the controversy was covered by an express contract). The elements are, however, identical in many states. At a minimum, a class could and should be certified for producers who sold cattle in South Dakota. This class could and should also include producers who sold cattle in other states where the common law elements of unjust enrichment are the same as in South Dakota. The second affidavit of Elizabeth J. Anderson (Doc. 209) includes exhibit nine, a claimed comprehensive list of cases setting forth the elements of an unjust enrichment claim in all states. She has also attached unreported cases for the various jurisdictions. Sub-classes could be established to group producers from various states having the identical elements of unjust enrichment claims. If any of this turns out to be unmanageable, I will de-certify one or more sub-classes.

[¶ 50] We have very experienced and responsible attorneys representing the parties here. Counsel should confer and attempt to agree as to what states have what common elements. If counsel are unable to agree, I will decide the issues. Ultimately, I will decide what sub-classes are to be certified beyond the certification as to South Dakota

---

**5.** The Supreme Court affirmed the Third Circuit's holding rejecting settlement-only class certification in *Amchem*, pointing out that:

"Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods." Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma. . . . Each has a different history of cigarette smoking, a factor that complicates the causation inquiry. "The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories." Differences in state law . . . compound these disparities.

*Amchem Products, Inc. v. Windsor*, 521 U.S. at 624, 117 S.Ct. at 2250.

producers and producers from other states with identical elements.

[¶ 51] I intend to limit the class treatment at this stage to core questions as described above. If liability is determined to exist, we will then determine whether particular class members suffered any legally compensable damages and, if so, in what amounts. "If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings. *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir.1994); *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1133–35 (9th Cir.2002); *Sterling v. Velsicol Chemical Corp., supra*, 855 F.2d at 1200; *Weiss v. York Hospital*, 745 F.2d 786, 809 (3rd Cir.1984); 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 17.10 (3d ed.1992)." *Mejdrech v. Met–Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir.2003). I agree with the quoted language and adopt it.

## ORDER

[¶ 52] IT IS ORDERED:

1) This action shall be maintained as a class action as to claims arising under the PSA on behalf of the following class of plaintiffs:

all persons or business associations that owned any interest in cattle that were intended for slaughter and who sold or permitted sale of such cattle (excluding culled dairy and beef cows and bulls) to defendants on the open spot cash cattle market, or on a basis affected by that market, between April 2, 2001, to and including May 11, 2001.

2) This action shall be maintained as a class action as to claims arising under the common law theory of unjust enrichment on behalf of the following class of plaintiffs:

all persons or business associations that owned any interest in cattle that were intended for slaughter and who sold or permitted sale of such cattle (excluding culled dairy and beef cows and bulls) to defendants on the open spot cattle market, or on a basis affected by that market, between April 2, 2001, to and including May 11, 2001, but only as to sales made by South Dakota producers and producers in other states with laws of unjust enrichment identical to that which is the law in South Dakota.

3) This action shall be maintained as a class action with sub-classes as to claims arising under the common law theory of unjust enrichment on behalf of the following classes of plaintiffs:

all persons or business associations that owned any interest in cattle that were intended for slaughter and who sold or permitted sale of such cattle (excluding culled dairy and beef cows and bulls) to defendants on the open spot cattle market, or on a basis affected by that market, between April 2, 2001, to and including May 11, 2001, but only as to sales made by cattle producers in states with identical laws of unjust enrichment but not following the law of unjust enrichment under South Dakota law.

4) The attorneys for the parties shall proceed as directed by the court in the body of this Order. Prior to publication of any class notice, the court will determine the class and sub-classes dealing with unjust enrichment as described in paragraphs two and three above.

5) Following the determination of the class or sub-classes pursuant to paragraphs two and three above, the court will determine the notice to be provided, the time limits, requirements for publication, and required proof of publication or notice.

6) Subject to further order of the Court, Herman Schumacher, Michael P. Callicrate, and Roger D. Koch are designated as class representatives and Maslon, Edelman, Borman & Brand, 3300 Wells Fargo Center, 90 S. 7th St., Minneapolis, MN 66402–4140, is designated as lead counsel for the class.